Please call for oral argument. This is Bruns v. Hagen. Counsel, whenever you're ready, please proceed. May it please the court and counsel, my name is James Richard Myers and I represent Bernard Bruns and Aaron Hentz in this case. Mr. Bruns and Ms. Hentz are appealing from an adverse decision at the trial court level. And in our brief that was filed, we identified three issues that we've asked the court to review. And with the court's permission, I'm going to go through those backwards because I believe that the last one actually is the most important. The last one, the trial court apportioned costs of anticipated work to be done on a mutual claim and levy system. In order for each party to bear the costs of any such work that was performed on their real estate. And it was the position of Mr. Bruns and Ms. Hentz that those apportionments were outside the scope of the hearing that was held and against the manifest weight of the evidence, in fact, against any evidence because there wasn't any. But as to the first point, in the record, I asked at the beginning of the hearing for clarification of the scope and the counsel advised that they were just planning on presenting evidence to the court as to what the historical levy system was. So that was fine with me. And then when we started talking about costs, not in that context, but another context, there was an objection that's in the record at R296 where there was an objection by Mr. Trelinzi who objected and said, I object at this point. I don't think that's set for hearing. I think we can address the issue once we know what he has the authority to do, he being his client. And so I think it's clear from the record that the understanding of the attorneys and the court was that we weren't going to address costs until later after perhaps some work was done in this on this system and somebody petitioned for an assessment of costs. And I find it disingenuous for anyone to stand here and say that somehow it was their understanding that we were addressing costs in this hearing that was held. Beyond that, and probably because there was no, at the time nobody was considering costs, there was no evidence on which a court could equitably apportion the costs of any maintenance or work that was going to be done on this levy system. Under the law, the statutes say that I don't have to pay for repairs that were made to this levy system. There is court law or case law that says that a court can equitably apportion the costs of repairments of a levy that somebody performs. And we acknowledge that. We've never denied that. But we're saying that A, it was never part of this hearing, but B, even if it was, no evidence was presented by anybody that would allow a court to make an equitable apportionment of the property, of the repairs and maintenance. And I think that there's several instances that point that out, and they're brief, of course, but Mr. Bernie Bruns, he testified, and I think everyone testified, that no water from this property even goes in this system. Yet he has a big, long piece of the levy on him that he's now responsible to repair, and if he doesn't repair, he gets to pay the cost for someone else repairing it. I don't know that there's any evidence that that's equitable. Ms. Hentz, there's evidence that her water, instead of going straight into the ditch, has to go up and around and through a big, smooth channel to get to the levy system drainage aspect of it, arguably delaying her water and putting burden on her. Yet she also has significant levy systems on her property that she would be responsible to repair. Contrast that to Mr. Boss, who this system arguably benefits because he's at the end, and he's the one that gets his water in there before other people. He doesn't have any levies on him, and he won't have any cost to repair levies, yet he's got a significant benefit to this system. And I'm saying all this just as examples because none of this was equitably apportioned at trial, and none of it came out in how these costs should be apportioned. So I think that the requirement that each landowner bear the cost to maintain and fix the levy on their system is against the manifest way of the evidence. In fact, there's no evidence that would allow a court to equitably apportion. But counsel, what was to be decided at the hearing then? This was a long process that had several hearings, and the first we in fact had a hearing on an injunction where we got all the work stopped so that people could slow down and figure out what was going on. There was a second hearing where there was evidence, and the issue was whether it was a mutual drain, in fact, or not. Once the court declared it to be a mutual drain, there was a hearing set on the rights and responsibilities of the parties as to this mutual drain. That's what the DACA award said. And so I wanted to be clear that we were talking about the rights and responsibilities of these parties, and that's why I brought it up before the hearing. Are we actually talking about costs? Because costs involve things other than that. They involve equitable apportionment. It depends what people are doing, and what people have to do is who may be benefited from it. And so the discussion was that costs was not going to be brought up at this hearing. It would be brought up later. I would anticipate after somebody actually did work and tried to recover those costs and was unsuccessful, then they could come to court and they could say, I fixed A, B, and C, or I dredged out A or whatever, and there would be concrete evidence that that may have affected somebody or may have benefited somebody. For instance, lots of times in drainage districts, they apportion those costs by how many acres you have that are protected by the levy system. There's no evidence of anything like that. There's no evidence of who has a greater benefit from this levy system than others. All we have is the judge saying, well, it's on your property, so you get to pay for it. And I think from the examples that I've cited, that can't possibly be equitable. So it is entirely possible, and I'm not saying that the court could not have considered and made apportionment of costs at this hearing, but it was specifically said when the hearing started that that's not what we're doing, and that was everybody's understanding that that's not what we're doing, and that that would come up later, if at all, if somebody paid to repair the levy system and wanted to be reimbursed from it from other people. So let me follow up on your answer. Go ahead. You're asking the Court of Equity to determine and allocate responsibility. One could argue that the responsibility inherently includes costs, but if a court of equity were to say that each party is responsible for their own costs, would that ruling preclude your client or one of the other parties coming in and saying, what I had to do was to this extent my responsibility, but it included a defined benefit for the other property owner, and I'm asking for reimbursement of those costs as a court of equity. The way I read that ruling, I don't think the ruling of the court would preclude that. I think that if we did something like that, if Mr. Bruns, for instance, repaired the levy on his system and then said, I don't owe any of this money because I got no benefit from it, I should be reimbursed from other people who do, I think that all those other people are going to scream that this order is res judicata, and it says right here that each party shall bear the cost of the necessary work on the dishes and levies upon their property, and I think that a trial court may well say that that's already been decided. The number six on this order says if you take that position, what is to preclude a court of equity from saying, you guys repair it, I'll allocate the costs involved, or saying initially I'm not even going to go through that, everyone bears their own responsibility for costs that they do on their land, and we're going to leave it at that. Is a court of equity constrained to do either one? I think a court of equity can make any allocation of costs it wants if it has sufficient evidence on which to make that assessment, which they didn't have in this case, because nobody presented any evidence of relative benefits and burdens of repair work. Nobody even said what the repair work was going to be. We went through and talked about things that might happen and things that needed to be done, but no one sat down and said I'm going to do this. No one sat down and said this is what it costs me. No one sat down and said I believe that this is a benefit 50% to me, 50% to you. None of that happened. All that was entered was an order that says each party bears its own cost, and frankly, if Mr. Hayden comes in and tries to say that we should pay, that Mr. Bruch should pay for work he does on his property, I'm going to say this order says I don't have to pay for that. And I think that all the parties here, including my parties, want to have an order of the court that makes it so we don't have to keep coming back to court. No one enjoys this. And so that's what everyone is going to say this is, that this is the order that sets forth the rights and responsibilities of the parties, including the allocation of costs for repair, and I would bet that that position would be raised by whoever is being charged for those costs, and it's quite likely, in my opinion anyway, that a trial court would say I've already decided that. That's part of an order that I already entered, that you have to bear the cost on your property. I would love it if what you suggest is the way it would work, and we have work done, and we say we're not paying for it. You go to court, you say what work did you do? You explain how that benefited everybody. You explain this protected 50 of your acres, or this repaired your levee, or this let your land drain better. You receive some benefit, and there's actually an allocation of those costs. But that's not what happened in this case, and I think that that's an error. The second point, if I can move on, is this part where the drainage code states that there's no statutory duty of any member of a mutual drainage system to repair or maintain the system. I cited case law to that effect beyond the statute, which is clear. Again, we don't dispute that point, but this order that was entered requires everybody, including Bernie Bruns and Aaron Hentz, to repair and replace levee. In paragraph two of the order from December 29th, it says each party shall have 90 days to complete cleaning of a ditch on their individual property. In paragraph three it says each of the parties shall be given a lifetime 90 days to rebuild and repair the levees on their individual properties. Those are full orders that mandate my people to do stuff. Council points out that there is a process written into this order where if they don't do that, then another person can come in and do the work and charge them money for it. Just because there's a remedy, just because there's an enforcement mechanism to make this court order enforceable doesn't take away from the fact that this is a court order. And when you read it, it says my people shall do this. And they're not the type of people that are going to say, you know, if the court orders me to do something, I'm not going to do it. They're going to wind up doing it because it's a court order. Without those remedies of the person coming in and paying the money and fixing it themselves and charging our people, you know, there would be a remedy. They could file a rule or so cause if my people didn't do this. In fact, they probably still could. And they could take other action to enforce this court order, which is plain on its face that everybody on the system, including Zonnie Bruns and Erin Hantzell, be ordered to do maintenance and repair on a drainage system, which is completely contrary to the law as written. So we think that that part has to be vacated as well. And then the final issue, the first issues I raised, I think, are a denotable review issue, statutory interpretation, things like that. The last one I don't think is. I think it's against the manifest way of the evidence standard, at least in part. But what the trial court was supposed to do in this hearing was determine what the drainage system was. When you have a drainage system on your property, it's an easement and it's set. And the statute says that you cannot change that without the consent of all the parties. And what has been happening in this case from day one is that certain parties are trying to engineer a new system with new dimensions and new heights and new areas, and they're calling it repair. And that's not what the drainage codes allows them to do, unless they get the consent of all the people. But they refuse to get the consent of all the people. So they're just doing it themselves, and we have to file suit to stop them, and we have to file suit to do these things. And so when we get to the trial court, the trial court is charged by statute to determine what the burdens of this drainage system were, not what's the best engineered system that will accomplish the drainage for this property, and not what do these people want to do that these other people don't want them to do. They're supposed to go in and they're supposed to determine what this drainage system looked like and what its planners were. And it's obvious and clear from the order that was entered that the court did not do that because they set the dimensions of the drainage system to a unknown future event, which is the depth that the township is going to use on a drainage ditch by a road that hasn't been done yet. And once that's done, then the parties have to re-engineer their system to match that drainage depth and then go back at a prescribed increment of slant to go all the way back so that this system drains. And that's not what the drainage codes allows, and that's not what the trial court is charged to do. That's judicial engineering, and that's not appropriate. Again, they're supposed to find what the historical and what the burdens were, and they didn't do that. Let me take some exceptions to the actual findings of the court, and I acknowledge that those are manifest rate of the evidence issues. But as to the court that is contentiously disputed in this case, I think that that finding is against the manifest rate of the evidence for several reasons. But most importantly, it defies logic to have water flow north, east, north, west, and south over a long distance. That just doesn't happen. And then there were several photographs entered, historical photographs from the government that showed that the ditch was open and could not have been levied up. And so the photographs, which don't have bias and don't forget stuff, showed open ditches. And science and the court, the trial court, I believe, took judicial notice of the fact that water flows downhill. There's case law that says you can take judicial notice of that. It defies logic to say that the water did not flow through there. So we've asked the trial court to remand us with directions as requested in our brief, and that's my argument. Thank you. Thank you, counsel. You gentlemen have split up the time? Yes, we have. Okay. Go right ahead. I'll split it at 10 and then you can. I bet Dick could kick me in the ankle if I go over my 10s. You know, I represent the original defendants, Hagan and Buss, and then they were the third-party plaintiffs that actually ended up bringing in all the parties in Section 33, all the landowners, so that we could have a comprehensive order that would address this. Addressing the issues, as Mr. Meyer has addressed them, the first issue of cost, the first thing I would point out is at this point in time this court has not ordered anybody to pay one dime of anything. The court found what it determined to be the mutual drain based on evidence. Obviously, we didn't have anybody there that could. This drain dates back to 19, this mutual drain dates back to 1914 based on the documentary evidence, deeds and so on. Obviously, we had no witnesses that could testify what it was in 1914. However, there were witnesses that testified all the way back to the mid to late 60s from personal observation and recollection. There was an expert witness hired by the defendant, Hagan, the third-party plaintiff, that testified and produced documentary evidence, including aerial photographs and so on, that essentially demonstrated what this drain system was all the way back to 1938. So the court had decades, decades worth of documentary and testimonial evidence as to what this drain system was. And we think the manifested evidence clearly showed that the basic problem occurred is that the plaintiffs here, Brooms, kept encroaching and farming and farming and farming until the point where the burn on their side of the ditch no longer existed. They farmed all the way to it. And that's what caused the underlying problem that my client was attempting to correct here to allow the system to work. And Mr. Myers was wrong to say that Brooms did not get any benefit from this. The benefit that they got was that the water from the north didn't come down onto them when this system was working efficiently and the burns were present because it kept that water channeled and kept it off his land. All of this, the evidence was undisputed that all of this, that's exhibit one, that all of this entire section ran to the road ditch on a driving road. Let me circle back to what you started your argument with. You said that no one's been ordered to pay any amount. Right. Doesn't the part of the court order that says each party bears the responsibility for their own costs, basically it may not have a dollar amount, but everyone's been ordered to pay something. Everybody's been ordered to return this mutual drain to what the court found historically it was. And the court, as I read the order, simply allow each landowner the first opportunity to do their own work on their own property themselves. And if they choose not to do so, if they don't, then any other party, or if they don't do it adequately, any other party can petition the court and then there'd be an evidentiary hearing. And they can come in and they can argue whatever they want, put on whatever evidence they want, and the court can make a determination at that point in time as to what is equitable. We're asking in order to be, the plaintiff is asking in order to be reversed. But at this point it's academic. Maybe, you know, if they do the work, it may be perfectly satisfactory and this issue will never come up. So I think it's certainly premature. And the other thing is what was the alternative for the court to do? The evidence was clear that that barn that existed on the Boone's property that had been farmed was no longer there. So the alternative was to say, Mr. Hagan or Mr. Buss, you have the right to go in there and rebuild that barn. The court simply said, no, let each party do their own work first. And if they do it, fine. If they don't do it, then we'll come back and we'll remedy the situation. And I think that's not only a reasonable thing to do, but an eminently intelligent and abortive, because, again, it may never come up. It may be that everything is done satisfactorily and we never have to address the issue. Of course, the drainage code specifically provides that once a mutual drain is founded, that each owner has an easement over everybody else's land to the extent necessary to repair or keep this going. So, again, this wasn't an academic exercise here. The point was to get this drain back into place that the court found it was. And if you recall the court's language in the initial order said that he found it was overwhelmingly proved by the evidence that this mutual drain existed. So, again, the court had the authority to simply say, all right, Mr. Hagan, you go in and you do what work you think is necessary to restore it to what I found it to be. The court really did the plaintiffs a favor here by saying I'll give you the chance to do it first. It didn't say I'm going to hold you in contempt if you don't. It said if it's not done to the satisfaction so that this system works, that's the point. We want a system that works for all these landowners. So these farmers have their land drained efficiently and they can farm. It's not an academic exercise to find out, to try and explore what happened in 1914. For all we know, we don't know really in 1914 if there was a road, a driving road was there or whether that ditch was maintained. But ultimately all that water has to go into the road ditch. So I think that addresses both the first and second point that this is a fair, this is an equitable order. And really, when you think about it, what is the alternative? What else was the court to do other than to say, why don't each of you guys do what you're supposed to do first? And if you don't, we'll come back and we'll hear the evidence before I drain the order. What about the situation that opposing counsel posed about the township and the action they made based on that? That's one of the keys to this case, Your Honor, is the township was not a defendant in this case. The court didn't have jurisdiction over the township. But even if it did, I can't imagine a circuit judge telling an elected township road commissioner who has responsibility for that road ditch, you're going to do this or you're going to do that. That's not what I asked. Right. Let's assume that the township as an independent government entity decides to do X. Right. Is there anything in the record that indicated what the township might do and how it might affect each of these individual parties? No, it didn't. But the point was that was a, I think the point of the circuit court was a recognition that he wasn't about to do the job of the township road commissioner or order him to do something, but that that is the receptacle. So that's the key. That's the starting point. As Mr. Meyer is indicating, water flows downhill. So if it's all going into the road ditch, we need to know before we can do anything else what the depth, once they clean out that road ditch, that's up to him. That's his discretion. But once he gets it done, which it's not in the record, of course, but I understand it's been done now, that establishes a depth and therefore allows the landowners to know the depth that they have to go into so it can all flow into the road ditch. So I think, again, the court was forced in that situation to say it's going to be dependent on what the township does. And I'm not going to order the township, but when the township does it, then you'll know what you guys will know what you have to do because then that will establish an ultimate depth. I'm thinking my ten minutes is probably up. Thank you, Counsel. Counsel? Good afternoon, Your Honor. Good morning, I guess. I'm going to move this closer if you don't mind. Go right ahead. I'm not sure if I'll really have to refer to it much, but this is actually how the system, this was an exhibit made by the agricultural engineer and this is where he thought the system was. He included all the way to this point. But Judge Jules only went 700 feet this way, so this last approximately 700 feet is not in the system as found by the court. But that may not even be necessary to refer to that. I guess I would go to Mr. Meyer's arguments in the same order he did. The question of did the court apportion costs improperly, I can see the point he's making. I think the easiest way to correct his order is simply take out paragraph 6. Paragraph 6 says each party shall bear the cost of the necessary work on their property. And then paragraph 8 says if anybody doesn't do it, the other party may petition this court to apportion the cost. That's what the law is. I think he was trying to short-circuit this by saying that it would be logical for each person to, if they go ahead and fix their part to the parameters he said, it would be logical that they don't try to make each other pay. But logic is not really the issue here. The issue is what does the statute say. So the paragraphs 2 and 3 where they say the party shall have 90 days to complete the cleaning of the ditch or shall be given the like time to do some other things, that shall to me doesn't mean it's mandatory. They have that period of time to do it. If they don't do it, then the paragraph 8 comes into effect. The issues about, he didn't really say very much about his historic arguments pertaining to the depth and slope of the ditch, but there's ample evidence in the record to show that you can tell the boundary between the compact subsoil all the way throughout the system and the sediment that's accumulated and that it's within the parameters of the system to clean out the sediment, not to clean out the subsoil because the subsoil has always been there and is supposed to stay there. So we don't care how many inches or how many feet, slope, the depth of the Township Road District, I mean Township Road, any of that, just as long as it stays to the original system, which there was a lot of testimony that it's easy to determine that, Hagan said he could do it, engineers said it could be done. Even Hagan, I mean sorry, Burns testified that in one place he thought that Hagan might have gone a little too deep because he could see the subsoil. So that's obvious, the answer there, we don't have the right to make it deeper. If the Township makes the ditch six feet deep, we don't have the right to make our ditch six feet deep. We have to stay with the original parameters unless there's an agreement. So people are making a lot about nothing here. The argument about, there was a lot of evidence, everybody testified their own grounds on there, except Mr. Pink here, who's my client. They contradicted each other, they contradicted themselves in their own testimony, but put it all together along with the other information the court had, and the court made a pretty good finding of what the system was over all these years. Mr. Talese already mentioned that there was actually expert analysis of older photos in the public record, not a lot, but by guys that are specifically trained and experienced in doing that from this engineering firm, and they confirmed things that that engineer said. Now, let me see, so the judge had this LiDAR map, made a topographical map in one foot increments of this whole place, and it's hard to read, the letters are in a strange color, but you can see the elevation all throughout this place, and the judge had that, and he could kind of compare the elevations of these levees with the elevations of the ground, and have a reasonable basis to determine if the levees needed to be, or they had to be if it were, a certain height. And nobody said it didn't work, nobody really argued about what it was like in the past. Bernie Brunza's testimony was variable, but eventually he admitted that, well, most of the levees had come down, his levee needed to be a little higher, a little higher, not disputed how much higher, that some of the other places where he didn't think there really should be levees, that, well, it had been higher, and it probably needs to be raised. So he also testified that the only thing in this whole case they cared about, and so did his brother, Michael, was that gap in the levee off of the landfill property into the main system ditch, that's the one that really started this whole case, and both of them testified that's the only reason we're in court right now, is because of that gap, that they don't think that there was a gap. Well, the problem is, the other owners have been there a lot longer, and both of the Brunza young men were a later generation. They both testified that their knowledge started around in the mid-90s, maybe more firm in 1999, as to what the situation with the ditch was then, or the system, but they didn't know what it was before that, and Hagen and Buss both had been familiar with the system since, approximately 40 to 45 years, but a lot further back than these guys. My contention is that the changes that Hagen made in 1999, as Kerr said, were not agreed by Brunza. There's no question of that. Now, the question is, when he did some things in 1999, was he restoring something that was historical or not? And Brunza's really don't know. They couldn't testify to that. They don't think so. They think, well, this levee wasn't here, that levee wasn't there, but they just don't even know, and so their knowledge is just limited, and the court took into consideration that. Another thing that I want to point out is that they keep saying, oh, it's not logical for a water to not run downhill. Obviously, that gap has to be there, but the court can take judicial notice that water runs downhill. Well, I would simply say that that's not necessarily true at all. The whole reason we had this system was so water would flow in a certain direction or on certain properties to certain properties and force it, in a sense, to not follow the natural course of drainage, which would have been basically willy-nilly sheet erosion over the whole system. The court wouldn't know, and I mentioned this in my brief on page 6, that during the beginning of this system, in the early years, when it was formed, when it was formed, the Anna Timmerman was one of the owners. She owned a whole lot of this ground, and she actually was one of the granddaughters that deeded an eight-foot strip to the Hagen family to put part of this ditch on. But then the other primary family was the Hagen family themselves. So David testified that Dave Hagen, he's a great-grandson of Anna Timmerman. His great-grandparents lived on the Winkler farm. Hagen was born on the Busch farm. Anna Timmerman owned the Hagen 80 and the Busch land. She owned the current-span Timmerman land. There were intermarriages, burst of parties to this case, on farms of other owners, changes in residence from one tract to the other, all within this system. It was certainly within their province to decide how they wanted to drain their land. And, for example, let's just say the owner of the Winkler tract, which is the superior tract of all these in height, it could drain, outdrain any of them or drain over any of them, including Bruns, including Hagen, all of them. But that's not to say that they didn't decide, all right, listen, we know we can make our water get off here faster, but we also know that hinders, let's just say, the Hagen family because maybe that was their son or their nephew or grandma. So we're going to make it so that this water doesn't overrun that place. We're going to steer it around a more circuitous method into a different place. That's what I'm arguing that they did. And they say, well, it's such a big distance to go. The ground is so close to level that it doesn't take a very big ditch to make water go downhill, so to speak. The surface may go one way, but the water can go in the ditch. And we're claiming that it was constructed so that the water would flow north along the east side of the Winkler levee. At that time, the Winklers owned all the land on the east side of the system. There's a hill, and they owned up the hill and down the other side. So presumably they agreed that it would be a benefit to somebody for the water to go the way they determined it to go. And they had that right. It doesn't have to be logical. There's no way we'll ever know for sure because they're all dead. But we have people that were committed to this system a lot longer than the Brunsbrothers. And we can take everything that the Brunsbrothers said that they know for a fact and we believe it. It doesn't change all the stuff that happened before that time. Is that it? Okay. Thank you, Counsel. Counsel? Thank you. This order that's been entered does not state by its own plain terms that anyone has an option to do anything. It says each of the parties shall have 90 days to complete. That's a court order to do something. If it was meant to be an option or a stay of other people doing something, then it could say that. It says each of the parties shall have 90 days to do work on the levy system, and that's contrary to the statute and can't stand. I would emphasize that by paragraph 8 that says in the event somebody doesn't do what they were ordered to do, the court may require the noncompliant party to deposit money. And so if I've had an option to do something and I don't do it, am I really noncompliant? No, I'm noncompliant if I don't do something I've been ordered to do. So this order orders them to do work on this levy system against the statute. This order also apportions cost. As it says in paragraph 6, each party shall bear the necessary work on the ditches and levies upon the property. And I would agree that if that wasn't in there, and we have paragraph 8 that said something like in the event some party does some work and they want to recover costs from another party, they can petition the court and seek a court order to have those costs equitably apportioned. That's not what paragraph 8 says. It says the noncompliant gets to deposit money to guarantee payment. But also if you go back to paragraph 6, it clearly says that costs are to be apportioned based on levies and ditches on your property. And then the last point I wanted to raise on rebuttal is it's clear that the judge's order requires work to be done on this levy system based on a future event, which is the setting of some debt on a township road, and it's impossible to have the historic depth and parameters of the levy system to be based on something that hasn't even happened yet. And so it's clear that the court went beyond its statutory authority and tried to engineer a system which it cannot do. It has to determine what the system was all those years back, all the way back to 1914 if it can. And it didn't. It said this is what it's going to be like going forward. And that's my argument. If I can answer questions that you have, otherwise I'll sit down. I don't think we have any. All right. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take this case under advisement. We're going to have a very short break.